WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Perry Peterson, | No. CV-14-02056-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| American Express, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff Perry Peterson's motion for partial summary judgment (Doc. 83), Defendant Equifax Information Services LLC's ("EQ") motion for summary judgment (Doc. 90), and Defendant Trans Union LLC's ("TU") motion for summary judgment (Doc. 96). For the following reasons, the Court grants in part and denies in part EQ and TU's motions for summary judgment and denies Peterson's motion for partial summary judgment.

**BACKGROUND**

**I.    Underlying Arbitration Decision**

In October 2011, American Express ("AMEX") sued Peterson and his business entity Adobe Financial Corporation for breach of contract related to money owed on an AMEX Business Credit Card. Def. Trans Union's Statement of Material Facts ("TUSOF") ¶ 4 (Doc. 93). The case was submitted to arbitration. Plf.'s Statement of Facts ("PSOF") ¶ 5, Ex. 1 (Doc. 84); TUSOF ¶ 5. In January 2013, the arbitrator entered a decision and award "dismissing all claims against . . . Peterson[.]" PSOF ¶ 5, Ex. 1. AMEX appealed. TUSOF ¶ 5, Ex. C. In November 2013, the arbitrator again entered a

1   ruling in favor of Peterson.   PSOF ¶ 7, Ex. 3; TUSOF ¶ 5.   In December 2013, the

2   arbitrator filed a final judgment award dismissing all of AMEX's claims against Peterson

3   with prejudice.  PSOF ¶ 7, Ex. 3.

4   **II.    Peterson's August 6, 2013 Letter**

5           On August 6, 2013, Peterson sent both EQ and TU (hereinafter collectively named

6   the credit reporting agencies or "CRAs") a letter requesting that they "[p]lease remove

7   the American Express ratings and information from my credit report."  PSOF ¶ 5, Ex. 1.

8   Peterson attached the January 2013 notice of arbitration decision and arbitration award as

9   well as a merged credit report from CIS Southwest to the letter.  *Id.*; Def. Equifax's

10  Statement of Material Facts ("EQSOF") ¶ 32, Ex. A (Doc. 91).  Neither the letter nor the

11  attached documents provided an account number or any other specifics about the AMEX

12  account at issue.  PSOF ¶ 5, Ex. 1; EQSOF ¶ 30, Ex. A; TUSOF ¶ 6, Ex. C.  At the time,

13  Peterson's credit file listed two AMEX accounts.  EQSOF ¶ 32; TUSOF ¶ 8, Ex. A-2.

14  Further when Peterson sent his August 2013 letter, AMEX's appeal of the arbitrator's

15  decision was still pending.  TUSOF ¶ 9, Ex. C.

16  **III.   TU's Response to Peterson's August 6, 2013 Letter**

17          Upon receipt of Peterson's letter, TU generated Peterson's credit file, which

18  showed that he had two AMEX accounts both reporting as charged off.  *Id.* ¶ 8, Ex. A-2.

19  TU then contacted Peterson and reported that "the information did not appear on [his]

20  Trans Union credit report."  *Id.*

21  **IV.   EQ's Response to Peterson's August 6, 2013 Letter**

22          When it receives a dispute, EQ creates a contemporaneous electronic record of it

23  which reflects when the dispute was received, how it was received, the steps taken in the

24  reinvestigation of the dispute, and the date the results of the reinvestigation are sent back

25  to the consumer.  *Id.* ¶ 10, Ex. A ¶ 12.  EQ then "reviews and considers" all of the

26  relevant information sent by the consumer.  *Id.* ¶¶ 11–13, Ex. A ¶¶ 13–15.  However, in

27  matters where further investigation is necessary, EQ notifies the data furnisher, *e.g.*,

28  AMEX, via an Automated Consumer Dispute Verification ("ACDV") form and "advises

it of the consumer's dispute, describes all relevant information, and provides the consumer's account information as it then appears in the consumer's [EQ] credit file." *Id.* ¶¶ 14, 16, Ex. A ¶¶ 16, 18.  The data furnisher then has a duty under the FCRA and by its contract with EQ to investigate the dispute and report back the results.  *Id.* ¶¶ 15, 21 Ex. A ¶¶ 17, 23.  Depending on the report by the data furnisher, EQ will either delete or otherwise update the consumer's account or it will do nothing to the account.  *Id.* ¶¶ 22, 23, Ex. A ¶¶ 24, 25.  Upon completion of the review, EQ notifies the consumer by letter of the results and advises the consumer of his or her rights under the FCRA.[1]  *Id.* ¶ 26, Ex. A ¶ 28.

After receiving Peterson's dispute, EQ initiated a reinvestigation of his account on August 13, 2013.  EQSOF ¶ 33, Ex. A ¶ 34.  Because Peterson's letter failed to specify which of his two AMEX accounts were at issue, EQ sent an ACDV to AMEX on both accounts indicating that Peterson "states inaccurate information."  *Id.* ¶¶ 35, 36, Ex. A ¶ 36, 37, Ex. B.  AMEX returned both ACDVs on August 14, 2013 and verified the accuracy of both accounts, "including [Peterson's] personal liability."  *Id.* ¶ 37, Ex. A ¶ 38, Ex. B.  As a result, EQ left Peterson's account unchanged.  *Id.* ¶ 38, Ex. A ¶ 39.

## IV.   Peterson's June 27, 2014 Letter

On June 27, 2014, Peterson again wrote EQ and TU disputing an AMEX account listed on his credit report.  PSOF ¶ 7, Ex. 3.  This time, Peterson identified the specific account in dispute.  *Id.*  Peterson stated that the account was "being reported inaccurately" and requested that it be "removed entirely from my credit report."  *Id.* Peterson attached the arbitrator's November 2013 under advisement ruling, the final December 2013 judgment award dismissing all of AMEX's claims against Peterson with prejudice, as well as a copy of his credit report from CIS Southwest.  *Id.*; TUSOF ¶ 14,

---

[1] EQ does not rely solely on consumer provided arbitration or court documents to update a consumer's file if, from the face of the documents, it is not clear to which account they relate.  EQSOF ¶ 55, Ex. A ¶ 55.  The same policy applies if there is information crossed out or handwritten on the documents, or if there is any doubt about the validity or legitimacy of the documents.  *Id.*, Ex. A ¶¶ 56, 57.  Finally, EQ agents are instructed to contact the data furnisher if they are ever in doubt about documents provided by a consumer.  *Id.*, Ex. A ¶ 58.

Ex. A-4.  None of the attached documents specified AMEX #473 or any other AMEX account.  EQSOF ¶ 45, Ex. A ¶ 46, Ex. C.  Peterson explained that the attached court documents meant that he was "not personally liable for [AMEX #473] . . . ."  PSOF ¶ 7, Ex. 3.

**V.      TU's Response to Peterson's June 27, 2014 Letter**

On July 3, 2014, TU received Peterson's June 27, 2014 letter and commenced a reinvestigation of his AMEX account.  TUSOF ¶ 15.  Attached to the ACDV it sent AMEX, TU added the following consumer comment: "Not liable for Acct (i.e. ex-spouse, business).  If liable, Provide Complete ID and ECOA Code.  Account involved in Litigation.  Verify All Account Information."  *Id.*, Ex. A-5.  Along with the ACDV, TU forwarded all of the documents Peterson included with his dispute letter.  *Id.* ¶ 16, Ex. A ¶ 12.  AMEX responded to TU's ACDV on July 9, 2014 and verified the accuracy of its account  *Id.* ¶ 17, Ex. A-6.  TU made no changes to Peterson's account after receiving AMEX's verification.  *Id.* ¶ 18, Ex. A-7.  Ultimately, on September 11, 2014, AMEX sent an Automated Universal Data Form to TU requesting it remove both AMEX accounts from Peterson's credit file; TU did so.  *Id.* ¶ 19, Ex. A.

**VI.     EQ's Response to Peterson's June 27, 2014 Letter**

On July 5, 2014, EQ received Peterson's dispute letter and initiated the same reinvestigation process previously described, including opening an ACIS case and sending an ACDV to AMEX regarding the account in question.  EQSOF ¶ 48, Ex. A ¶ 49, Ex. D.  EQ also sent AMEX all of the documents attached to Peterson's letter.  *Id.* ¶ 50, Ex. A ¶ 51.  Again, besides Peterson noting the AMEX account in his letter, neither the under advisement ruling nor the judgment award specified the account subject to the arbitrator's holdings.  *Id.* ¶ 45, Ex. A ¶ 46, Ex. C.  On July 9, 2014, AMEX answered EQ's ACDV and verified the accuracy of the AMEX account.  *Id.* ¶ 52, Ex. A ¶ 53.  As a result, EQ did not remove the account from Peterson's credit file.  *Id.* ¶ 53, Ex. A ¶ 54. EQ notified Peterson of the result of the reinvestigation on July 9, 2014.  *Id.*

/ / /

## VII.    Damages

Peterson's complaint lists no specific damages except to pray for statutory damages in varying amounts for violations of the FCRA, the Fair Debt Collections Act, and the Arizona Deceptive Trade Practices Act.  (Doc. 1, Ex. 3 at 8–10.)  In response to deposition questioning, however, Peterson indicated the specific damages he believed he suffered as a result of the CRAs' violations.  TUSOF ¶¶ 26–42; EQSOF ¶¶ 61–77.

# DISCUSSION

## I.    Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248).  Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

Although "[t]he evidence of [the non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by: (A) citing to particular parts of materials in the record . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment," and evidence must be authenticated before it can be considered. *Orr v. Bank of Am.*, 285 F.3d 764, 773–74 (9th Cir. 2002).

## II.   Analysis

EQ and TU both move for summary judgment on all of Peterson's causes of action.

### A.   The CRAs' Motions for Summary Judgment

#### 1.   Fair Credit Reporting Act

Peterson's complaint alleges that the CRAs violated the FCRA when they both "failed to review all relevant information provided by the Plaintiff as required pursuant to . . . § 1681i(a)(2), and . . . § 1681s-2(b)(1)(B)" and "failed to adequately conduct an investigation with respect to the disputed information as required by . . . § 1681s-2(b)(1)." (Doc. 1, Ex. 3 at 5.)

##### a.   § 1681s-2(b)

§ 1681s-2(b) imposes certain affirmative duties on furnishers after a furnisher receives information of a dispute from a consumer reporting agency. A furnisher is a person or entity that "furnishes information to a CRA." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1154 (9th Cir. 2009). The subsection, however, does not impose any duty, nor does it create any cause of action, against a CRA. *See id.* Accordingly, to the extent Peterson alleges that the CRAs violated § 1681s-2(b), the allegations are dismissed.

##### b.   § 1681i

Peterson clarifies his § 1681i allegation in his motion for partial summary judgment. (*See* Doc. 83 at 2–3.) In it, Peterson argues that the CRAs, after receiving his

August 6, 2013 and June 27, 2014[2] letters disputing the presence of an AMEX account on his credit history, violated the FCRA by then failing to conduct a proper reinvestigation pursuant to § 1681i(a)(1), and by failing to forward Peterson's dispute notification and attached documents along to AMEX pursuant to § 1681i(a)(2).[3]   (Doc. 83 at 2–3.) Peterson, although not explicitly, raises both a claim for negligent and willful noncompliance with the FCRA.  *See* § 1681n (willfull); § 1681o (negligent).

"[I]f the completeness or accuracy of any item of information contained in a consumer's file at a [CRA] is disputed by the consumer and the consumer notifies the agency . . . of such dispute," § 1681i triggers a duty upon the CRA that it "shall, . . . conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate . . . ." § 1681i(a)(1)(A).  "In conducting any reinvestigation . . . with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer . . . with respect to such disputed information."  § 1681i(a)(4).  The CRA is also obligated to "provide notification of the dispute to any person who provided any item of information in dispute . . . [and] [t]he notice shall include all relevant information regarding the dispute that the agency has received from the consumer . . . ."  § 1681i(a)(2)(A).

To establish a claim under § 1681i(a), Peterson must show that: "(1) [he] notified [the CRAs] directly of a disputed item in his credit file; (2) [the CRAs] failed to reinvestigate free of charge and either record the current status of the disputed information or delete the item from the file as required by § 1681i(a)(5) within the 30–

---

[2] Peterson alleges in his complaint that he also sent a third December 27, 2013 dispute letter via U.S. Mail to the CRAs.  (Doc. 1 ¶ 12.)  The CRAs dispute the existence of the letter, TUSOF ¶ 12, Ex. A ¶ 11; EQSOF ¶¶ 59, 60, Ex. A ¶ 59, and Peterson provides no factual support in his motion or in any response to the CRAs' motions that supports the existence of a December 2013 letter.  Therefore, the Court only recognizes Peterson's August 2013 and June 2014 dispute letters.

[3] Peterson does not cite § 1681i(a)(1) in his complaint; however, as a pro se litigant the Court construes his complaint liberally.  *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a pro se plaintiff's] complaint, 'however inartfully pleaded' are held 'to less stringent standards than formal pleadings drafted by lawyers.'") (citations omitted).  Moreover, the CRAs concede that Peterson intended to raise § 1681(a)(1) by addressing it throughout their motions for summary judgment.

day period; (3) [the CRAs'] failure to comply with the statute was negligent; (4) [and the CRAs'] failure caused [Peterson's] injury." *Acton v. Bank One Corp.*, 293 F. Supp. 2d 1092, 1098 (D. Ariz. 2003). Peterson must also establish other related threshold issues and legal assumptions like whether Peterson's "credit file [actually] contain[ed] inaccurate or incomplete information" and whether Peterson suffered "[a]ctual damages" from the violation. *See Thomas v. Tans Union, LLC*, 197 F. Supp. 2d 1233, 1236 (D. Or. 2002); *see also Roybal v. Equifax*, 2008 WL 4532447, at *4 (E.D. Cal. Oct. 9, 2008).

### i. Existence and notification of inaccuracy

The Ninth Circuit requires "that a plaintiff filing suit under [§] 1681i must make a 'prima facie showing of inaccurate reporting.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010) (citation omitted). "[A]n item on a credit report can be 'incomplete or inaccurate' within the meaning of the FCRA's furnisher investigation provision, 15 U.S.C. § 1681s–2(b)(1)(D), 'because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" *Id.* (*quoting Gorman*, 584 F.3d at 1163). Here, a debt that is reflected on Peterson's credit report that, by law, should not be attributed personally to Peterson meets the threshold showing of an inaccuracy under the FCRA. TU argues, however, that Peterson is attempting to "mount collateral attacks on the legal validity of [his] debts in the guise of [an] FCRA reinvestigation claim[]." *Id.* at 891. While it is true that "a consumer disputing the legal validity of a debt that appears on her credit report should first attempt to resolve the matter directly with the creditor or furnisher . . . since whether the consumer has a valid defense [to the debt] is a question for a court to resolve in a suit against the creditor, not a job imposed upon [CRAs] by the FCRA[,]" here, Peterson already attempted and arguably resolved the validity of the debt directly with AMEX via arbitration. *Id.* at 892; PSOF ¶ 5, Ex. 1; EQSOF ¶ 29, Ex. A ¶ 31, Exs. A, B. Thus, there is no issue of a collateral attack; rather, the issue is whether there are any disputes of material fact on whether Peterson failed to notify the CRAs directly of the disputed debt in his August 2013 and June 2014 letters.

Peterson's August 2013 letter failed, as a matter of law, to notify the CRAs of the disputed item in his credit file.  The uncontroverted evidence demonstrates that Peterson's credit file at that time reflected two AMEX accounts, and that his letter failed to identify the specific AMEX account at issue.  Nor did any of the attached arbitration documents specify the disputed AMEX account.  The notice of arbitration decision only states that "Plaintiff [*i.e.*, AMEX] has the burden of proof" and "Plaintiff [] did not meet its burden of proof."   PSOF ¶ 5, Ex. 1; EQSOF ¶ 29, Ex. A ¶ 31, Ex. A.  Nothing about the decision even implies that it is related to a credit card besides AMEX being the plaintiff.  Further, the arbitration award is equally as vague since it "dismiss[es] all claims against Defendant Perry Peterson[,]" but fails to identify those claims.  PSOF ¶ 5, Ex. 1; EQSOF ¶ 29, Ex. A ¶ 31, Ex. A.  Even viewing the August 6, 2013 letter in the light most favorable to Peterson, it fails to satisfy the first element of a § 1681i claim, and thus the Court grants the CRAs' motion for summary judgment as to any portion of Peterson's FCRA claim arising out of that letter.

On the other hand, Peterson's June 27, 2014 letter and attached arbitration documents raises a dispute of material fact as to whether the letter notified the CRAs of the disputed AMEX account.  The letter itself identified the account at issue, and while the under advisement ruling did not go so far as to list the AMEX account number, it listed enough facts, mainly the amount of alleged debt, for the CRAs to deduce the specific AMEX account Peterson sought to dispute.  PSOF ¶ 7, Ex. 3; EQSOF ¶ 40, Ex. A ¶ 41, Ex. C.   A reasonable jury could find that Peterson's June 27, 2014 letter adequately notified the CRAs of the disputed item on Peterson's credit report.

### ii.        Reasonableness of the CRAs' reinvestigation

There is no dispute that the CRAs initiated reinvestigation procedures in response to receiving Peterson's June 27, 2014 dispute letter.  Peterson, however, argues that their reinvestigations were unreasonable in application.  The facts demonstrate that both of the CRAs submitted ACDVs to AMEX that attached all of the documents Peterson included with the June 2014 letter: under advisement ruling, arbitration award, and CIS credit

report.  Peterson, nonetheless, argues that the CRAs had a duty to go beyond verifying the debt with AMEX via the ACDV procedure.  (Doc. 103 at 4; Doc. 116 at 6.)  A number of courts, however, recognize the ACDV process as a reasonable method to reinvestigate disputed information.  *See , e.g.*, *Bagby v. Experian Info. Sys.*, 162 F. App'x 600, 606–07 (7th Cir. 2006); *Dickens v. Trans Union Corp.*, 18 F. App'x 315, 319 (6th Cir. 2001).   Nonetheless, this Circuit recognizes that questions of reasonableness are necessarily jury questions.  *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (reasonableness will be a jury question "in the overwhelming majority of cases"); *see also Acton*, 293 F. Supp. 2d at 1099 (denying summary judgment and holding that "the reasonableness of [a CRA's] [reinvestigation] procedures is a question for the jury to decide"); see also *Thomas*, 214 F. Supp. 2d at 1237 (reasonableness is a question of fact);

Here, therefore, in light of the fact that AMEX continued to verify that the disputed account should remain on Peterson's credit report despite the undisputed fact that an arbitrator found Peterson not personally liable for it, a jury could find that the CRAs needed to undergo more than just its normal ACDV reinvestigation process in this case.  *See Cushman v. Trans Union Corp.*, 115 F. 3d 220, 225 (3d Cir. 1997) ("We hold that in order to fulfill its obligation under § 1681i(a) 'a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial source of information[,]'" one of those circumstances is "'whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable.'") (citations omitted).  It is not clear as a matter of law that the CRAs reasonably reinvestigated Peterson's disputed account.  Summary judgment for the CRAs is, therefore, not appropriate on this element.

### iii.    Damages

Peterson, in order to survive summary judgment, must still prove that under undisputed facts he, as a matter of law, suffered compensable damages caused by the

CRAs' allegedly unreasonable reinvestigation of the AMEX account after Peterson disputed it in his June 27, 2014 letter.  "A [CRA] which negligently fails to comply with a requirement of the FCRA is liable for any actual damages sustained by a consumer. Specifically, a negligent violation of . . . FCRA § 1681i(a) subjects a [CRA] to liability for any actual damages sustained as a result of the violation, costs of court, and reasonable attorney's fees.  A willful violation of . . . § 1681i(a) subjects the [CRA] to punitive damages."  *Acton*, 193 F. Supp. 2d at 1099. (internal quotation marks, parentheticals, and citations omitted).  Peterson "has the burden of proving that his damages were caused by the defendant's violations of the FCRA."  *Id.* (citation omitted).

Peterson, through deposition testimony, alleges that the CRAs' FCRA violations caused the following damages: (1) lost business opportunities, (2) increased insurance rates, (3) lower credit limits, and (4) emotional distress.

### (a)     Pre-reinvestigation damages are not recoverable

Peterson "could not have been damaged by [a CRA's] failure to comply with § 1681i until the 30-day reinvestigation period expired."  *Acton*, 193 F. Supp. 2d at 1100. In other words, only injuries that occurred after August 2, 2014 for TU (30-days after TU received Peterson's June 2014 letter on July 3, 2014) or August 4, 2014 for EQ (30-days after EQ received Peterson's June 2014 letter on July 5, 2014) may satisfy the damages element of Peterson's § 1681i claim.

Peterson alleges that the CRAs' FCRA violations resulted in him receiving a June 26, 2014 adverse action letter from 1st Residential Mortgage denying him credit needed to purchase an auto repair lending company.  TUSOF ¶¶ 32, Ex. C at 203: 3–25, 33, Ex. J. The adverse action letter arrived previous to the legally cognizable timeframe and is thus not recoverable here.

Furthermore, Peterson alleges injury stemming from other credit inquiries by 1st Republic Mortgage and Enterprise Bank.  TUSOF ¶ 29, Ex. A-5.  Peterson's credit file reports inquiries by both banks dated between February 2, 2013 and June 26, 2014.  *Id.*

1    Any credit decisions based on these inquiries do not trigger damages under the FCRA for

2    violations by the CRAs related to Peterson's June 27, 2014 dispute letter.  Both banks'

3    inquiries fall outside the cognizable timeframe.  Accordingly, the foregoing alleged

4    injuries cannot support Peterson's FCRA claim.

5                              **(b)**      **Lost business opportunities**

6           The FCRA defines a "consumer" as "an individual," § 1681a(c), and provides for

7    the recovery of "any actual damages sustained by the consumer," §§ 1681o(a)(1),

8    1681n(a)(1)(A).  "It does not provide for protection for business entities, and courts have

9    held since its initial passage that 'both the legislative history of the Act and the official

10   administrative interpretation of the statutory terminology involved compel the conclusion

11   that the Act does not extend coverage to a consumer's business transactions.'"  *Wisdom v.*

12   *Wells Fargo Bank NA*, 2012 WL 170900, at *2 (D. Ariz. Jan. 20, 2012) (*quoting*

13   *Sizemore v. Bambi Leasing Co.*, 360 F. Supp. 252, 254 (N.D. Ga. 1973) (a credit report

14   issued in connection with a commercial lease application not protected by the FCRA));

15   *see also Matthews v. Worthen & Trust Co.*, 741 F.2d 217, 291 (8th Cir. 1984) (finding

16   transaction exempt from FCRA because a credit report was used solely for a commercial

17   purpose); *Vandyke v. N. Leasing Sys., Inc.*, 2009 WL 3320464, at *4 (E.D. Cal. Oct. 14,

18   2009) ("A report about a consumer pertaining to credit in connection with a business

19   operated by that consumer is not a consumer report.  Therefore, the FCRA does not apply

20   to it.").  The Congressional Record also reflects that the FCRA was designed "to protect

21   consumers from inaccurate or arbitrary information in a consumer report . . . .  It does not

22   apply to reports used for business, commercial, or professional purposes."  116 Cong.

23   Record 36, 572 (1970).  Furthermore, the Federal Trade Commission has interpreted the

24   FCRA to deny protection for credit reports requested for commercial purposes, stating

25   that "[a] report on a consumer for credit or insurance in connection with a business

26   operated by the consumer is not a consumer report and the Act does not apply to it."

27   FTC Interpretation under the Fair Credit Reporting Act, 16 C.F.R. Pt. 600, App. § 603

28   cmt. (6)(B).

1      Peterson alleged that because the CRAs failed to remove the AMEX account from

2  his credit file, his resulting lower credit score prohibited him from participating in various

3  business opportunities.  EQSOF ¶ 63, Ex. B at 178: 15–18, 180: 4–5, 299: 2–300: 13.

4  These included an opportunity to invest in an apartment complex, TUSOF ¶ 34, Ex. C at

5  211: 11–213: 17, and the opportunity to purchase an auto repair lending company,

6  TUSOF ¶ 32; EQSOF ¶ 63, Ex. B at 350: 8–14.  Specifically, Peterson sought, but was

7  denied, a home equity line of credit in order to secure the financing to purchase the auto

8  repair lending company.  TUSOF ¶ 32, Ex. C at 44: 15–16, 45: 11–14, 203: 3–204: 11.

9  Even assuming, *arguendo*, that Peterson was denied credit because of the CRAs' alleged

10  failure to properly remove the AMEX account from Peterson's credit file, because the

11  CRAs' alleged violation affected Peterson's efforts to engage in business transactions, the

12  injury fails to satisfy the damages element of Peterson's FCRA claim.  *See Wisdom*, 2012

13  WL 170900, at *2.

### (c)      Insurance rates

15      Peterson testified that he "kn[ew] insurance companies pull your credit to

16  determine your rate.  So, I can only assume that I'm affected like anyone else."  TUSOF

17  ¶ 36, Ex. C at 253: 2–9.  Peterson also testified that USAA was his insurance carrier.

18  TUSOF ¶ 36, Ex. C at 297: 17–25.  Peterson points to a Farmers Insurance promotional

19  inquiry to support his assumption that the CRAs' alleged FCRA violations affected his

20  insurance rates.  (Doc. 116 at 10.)  Peterson provides no other evidence on the subject.

21      Farmers Insurance is not Peterson's insurance carrier; therefore, its inquiry is

22  irrelevant to support Peterson's allegation that his insurance rates increased.

23  Furthermore, the Farmers Insurance inquiry occurred in July and September 2013, long

24  before the damages timeframe.  And finally, TU affirmatively proved that USAA,

25  Peterson's actual insurance carrier, never sought a credit file at any point.  For these

26  reasons, summary judgment is appropriate to eliminate insurance rate damages from

27  Peterson's FCRA claim.

28  / / /

1

**(d)     Lower credit limit**

Peterson contends that at least one of his personal credit cards, a Cabela's Visa card issued by World's Foremost Bank, lowered his credit limit because of the CRAs' alleged violations of the FCRA.  TUSOF ¶ 37; EQSOF ¶ 65, Ex. B at 180: 13–22, 183: 3–23.  Cabela's sent a letter dated September 6, 2012 informing Peterson that his credit limit had been decreased due to information contained in his credit report.  TUSOF ¶ 37, Ex. F.  The letter specified that "[s]ome or all of the information upon which [Cabela's] decision was made was received from" an EQ provided credit report.  *Id.*

First, the letter eliminates any connection between Cabela's decision to lower Peterson's credit limit and TU since Cabela's only considered EQ's credit report.  Second, Cabela's decision to lower Peterson's credit limit occurred well before the compensable timeframe for damages.  Accordingly, any injury inherent in Cabela's decision to decrease Peterson's credit limit is not recoverable as part of his FCRA claim against either of the CRAs.

**(e)     Emotional distress**

"The FCRA permits recovery for emotional distress and humiliation."  *Drew v. Equifax Info. Sys., LLC*, 690 F.3d 1100, 1109 (9th Cir. 2012).  "To survive summary judgment on an emotional distress claim under the FCRA, Plaintiff must submit evidence that reasonably and sufficiently explains the circumstances of his injury and does not resort to mere conclusory statements."  *Centuori v. Experian Info. Solutions, Inc.*, 431 F. Supp. 2d 1002, 1010 (D. Ariz. 2006) (internal quotation marks and citation omitted).  Besides the inappropriateness of mere conclusory statements, the Ninth Circuit has not yet addressed the type of evidence necessary to support an award of emotional distress damages under the FCRA.  Other Arizona district courts, however, have applied the Ninth Circuit's analysis of emotional distress damages in other contexts.  *See, e.g.*, *Acton*, 293 F. Supp. 2d at 1101.  In *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003), the court opined that as to emotional distress damages, "[w]hile objective evidence requirements may exist in other circuits, such a requirement is not imposed by case law in

the Ninth Circuit, or the Supreme Court." *Id.* at 1040.  The Ninth Circuit has also recognized that "compensatory damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms." *Johnson v. Hale*, 13 F.3d 1351, 1352–53 (9th Cir. 1994).

In response to questions about his emotional damages, Peterson testified: "I feel pain in my neck . . .  Just my relationship with my wife and kids over the stress, and the issues regarding this American Express thing[,]" and "start[ing] in June of 2014, when I found out I couldn't invest in my buddy's company . . . I tend[ed] to snap and take the stress out on [my wife and family]."  EQSOF, Ex. B at 178: 17–25, 198: 1–7.  He further testified "I'm humiliated every time I get a business opportunity, or somebody talks to me about a proposal, or purchasing something, or whatever.  I've been humiliated because I wouldn't be able to get credit to take advantage of opportunities."  EQSOF, Ex. B at 199: 2–6.    In addition, Peterson found it difficult to sleep throughout what he described as "this American Express episode, and the [American Express] trial, and now against the aftermath with this trial."  EQSOF, Ex. B at 195: 1.  A denial of credit is not a prerequisite to recovery for emotional distress damages under the FCRA.  *Guimond*, 45 F.3d at 1333; *Acton*, 293 F. Supp. 2d at 1100 ("Courts have allowed recoveries where . . . the plaintiff suffered mental anguish based on events other than a denial of credit.") (internal quotation marks and citation omitted).  Further, to the extent that the CRA's argue that the remainder of Peterson's credit report demonstrates that this credit entry was not the cause of any of his damage, such an argument is one appropriately made to the jury.  Peterson has described sufficient symptoms of emotional distress to raise a dispute of material fact as to such an injury.[4]

---

[4] TU argues that Peterson's emotional distress symptoms "arise[] entirely from his participation in this lawsuit[,]" and as such, the law precludes recovery for mental anguish or emotional damages associated with participating in litigation triggered by the complaining party.  (Doc. 96 at 19.)  TU, however, cites no authority from this circuit supporting that contention.  Furthermore, although Peterson initiated this lawsuit which he claims caused, in part, some of his emotional distress damages, a jury could conclude that Peterson's lawsuit would have never been filed but for the CRAs' FCRA violations.

### iv.    Willful violation of § 1681i

Peterson also alleges a willful violation of the FCRA.  "[T]he statutory requirement of willfulness does not require proof of an intent to cause harm, but only an intent to fail to comply with the FCRA."  *Centuori*, 431 F. Supp. 2d at 1011 (*quoting* § 1681n(a)).  A reckless violation of the FCRA will also satisfy the statute's willfulness requirement.  *Id.* (citation omitted).  Here, Peterson supplies no facts to demonstrate a willful violation; therefore, the Court grants summary judgment on Peterson's willfulness claim.

### 2.    Fair Debt Collections Act

Peterson alleges that the CRAs violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e, which lists a number of actions that a "debt collector" may not take.  The CRAs in this case are not "debt collectors" within the meaning of the statute.  *See Gaft v. Mitsubishi Motor Credit of Am.*, 2009 WL 3148764, *10 (E.D.N.Y. Sept. 29, 2009) (dismissing FDCPA claim against Equifax); *Brumby v. Trans Union LLC*, 2008 WL 3823712, *2 (M.D.N.C. Aug. 13, 2008) (dismissing FDCPA claim against Trans Union).  Accordingly, summary judgment is granted on this claim.

### 3.    Defamation

Peterson raises a state law claim for defamation arguing that the CRAs "knowingly reported false and defamatory information . . . knew the information was false, acted in a reckless disregard for the Plaintiff's reputation and acted negligently in failing to ascertain the facts."  (Doc. 1 ¶ 41.)  As the CRAs point out, the FCRA preempts "any action or proceeding in the nature of defamation . . . with respect to the reporting of information against any consumer reporting agency . . . based on information disclosed pursuant to section . . . 1681m of this title . . . based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer."  § 1681h(e); *see also Gorman*, 584 F.3d at 1165–67 (acknowledging that the FCRA preempts state law defamation claims under either § 1681h and § 1681t of the

---

*See Centuori*, 431 F. Supp. 2d at 1011.

statute).   The Ninth Circuit defined the standard for "malice" as "requiring [that] the publication be made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'"   *Gorman*, 584 F.3d at 1168 (*quoting New York Times v. Sullivan*, 376 U.S. 254, 279–80 (1964)).   Reckless disregard is proven when the plaintiff puts forth "'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'"   *Id.* (*quoting St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

Peterson only posits conclusory allegations that the CRAs acted with intent to harm, asserting that the CRAs ignored their duty to investigate and disregarded their obligation to forward Peterson's dispute documentation to AMEX.   This is insufficient to set forth a prima facie claim of malice or reckless disregard.   Summary judgment is thus granted.

### 4.  Intentional Infliction of Emotional Distress

Intentional infliction of emotional distress ("IIED") requires proof of three elements: "first, the conduct by the defendant must be 'extreme' and 'outrageous'; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct."   *Citizen Publ'g Co. v. Miller*, 210 Ariz. 513, 516, 115 P.3d 107, 110 (2005) (internal quotation marks and citations omitted).   "Even if the second and third elements are present, the trial court must, on the first element, make a preliminary determination whether the conduct may be considered so outrageous and extreme so as to permit recovery."   *Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 199, 888 P.2d 1375, 1386 (Ariz. Ct. App. 1994). To meet that showing, Peterson must demonstrate that the conduct was "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."   *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 554, 905 P.2d 559, 562–63 (Ariz. Ct. App. 1995) (citation omitted).    The "issue may only go to the jury where 'reasonable

minds may differ.' . . .  [Moreover,] [e]ven if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'"  *Nelson*, 888 P.2d at 1386 (internal quotation marks and citations omitted).

The CRAs' conduct, as alleged by Peterson, cannot be considered, even by differing reasonable minds, to reach the outrageous and extreme standard espoused in *Mintz*.  As discussed previously, the CRAs engaged, at worst, in deficient reinvestigation procedures in response to Peterson's June 27, 2014 dispute letter.  Nothing about that conduct can be "regarded as atrocious and utterly intolerable in a civilized community." *Mintz*, 905 P.2d at 563.  Because Peterson cannot establish the first element of his IIED claim, the cause of action does not survive summary judgment.

### 5.    Arizona Consumer Fraud Act

"The Arizona Consumer Fraud Act is a broad act intended to eliminate unlawful practices in merchant-consumer transactions."  *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992) (*citing State ex rel. Corbin v. Hovatter*, 144 Ariz. 430, 431, 698 P.2d 225, 226 (Ariz. Ct. App. 1985)).  The Act defines "unlawful practice" as:

> The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby . . . .

Ariz. Rev. Stat. Ann. § 44-1522(A).  The Act provides an injured consumer a private right of action against a party who violates the Act if the consumer can show "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury."  *Holeman*, 803 F. Supp. at 242 (*citing Dunlap v. Jimmy GMC of Tuscon, Inc.*, 136 Ariz. 338, 342, 666 P.2d 83, 87 (Ariz. Ct. App. 1983)).  "Damage or injury occurs when the consumer relies on the misrepresentation even though the reliance is not reasonable."  *Id.* (citation omitted).  The

1    consumer "has the burden of proving these elements by a preponderance of the

2    evidence." *Id.* (citation omitted).  "The clear intent of this provision is to protect unwary

3    buyers from unscrupulous sellers."  *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*,

4    971 F.2d 401, 407 (9th Cir. 1992).  And merchandise, defined as "any objects, wares,

5    goods, commodities, intangibles, real estate or services," § 44-1521(5), must be involved.

6    *See Holeman*, 803 F. Supp. at 243.

7        Peterson argues that the CRAs "knowingly sold credit reports and offered credit

8    reporting services that were deceptive, unfair and misrepresented and omitted facts that

9    others relied on regarding [Peterson's] credit history."  (Doc. 103 at 12.)  Furthermore,

10   while Peterson states in his response brief to TU's motion that he "paid for the credit

11   report when applying for credit (sic) June 26, 2104[,]" Peterson provides no factual

12   support for the contention.  Therefore, no genuine dispute of fact exists as to whether

13   Peterson purchased anything from the CRAs.  Accordingly, his claim attempts to assert a

14   private right of action based on the alleged deception suffered by third-party users of his

15   credit report.  This is improper since Peterson must be the target of the deceptive practice

16   in order to raise such a claim.  *See Sutter Home Winery, Inc.*, 971 F.2d at 407 (dismissing

17   Arizona Consumer Fraud Act claim because plaintiff was not the buyer and thus not the

18   target of the alleged deceptive advertising).  Furthermore, Peterson cites no facts

19   supporting any genuine indication that the CRAs engaged in any form of fraud, false

20   promise, or other form of deception in its practices. The Court, consequently, grants the

21   CRAs' motion for summary judgment on this cause of action.

22       **6.    Other Causes of Action**

23       Peterson also asserts separate causes of action for "financial injury," "willful and

24   malicious injury," and "willful non-compliance."  (Doc. 1 at 7–8.)  Arizona law does not

25   recognize these allegations as separate causes of action.  Accordingly, they are dismissed.

26       **7.    Injunctive Relief**

27       Peterson seeks injunctive relief under each of his alleged causes of action.  (Doc.

28   1.)  Specifically, Peterson repeatedly contends that he "is entitled to an injunction

- 19 -

requiring Defendants to correct his credit report, money damages and any other relief available under the law." (Doc. 1 ¶¶ 23, 31, 35, 39, 42, 45, 48, 51.)  Because the only surviving cause of action is a portion of Peterson's FCRA claim, the question is whether injunctive relief is available under the FCRA.  It is not.  District courts in the Ninth Circuit consistently hold that a private party may not obtain injunctive relief under the FCRA.  *Gauci v. Citi Mortg.*, 2011 WL 3652589, at *3 (C.D. Cal. Aug. 19, 2011); *see, e.g.*, *Howard v. Blue Ridge Bank*, 371 F. Supp. 2d 1139, 1145 (N.D. Cal. 2005); *Purcell v. Spokeo, Inc.*, 2014 WL 4187157, at *6 (C.D. Cal. Aug. 25, 2014) ("To extent this claim [for declaratory and injunctive relief] is premised on [defendant's] alleged violation of the FCRA, equitable relief is not available.").

### B.    Peterson's Motion for Summary Judgment

Peterson asks the Court to hold, as a matter of law, the CRAs liable for violations § 1681i.  As explained above, Peterson's FCRA claim seeking emotional distress damages shall move forward.  Nevertheless,  the motion is based on factual assertions as to which there are genuine disputes of material fact.  Thus, Peterson's motion for summary judgment is denied.

### CONCLUSION

For the foregoing reasons, the Court DENIES the CRAs' motions for summary judgment as to Peterson's FCRA claim seeking emotional distress damages.  Otherwise, the Court GRANTS the CRAs' motions for summary judgment on all of Peterson's remaining causes of action.  The Court also DENIES Peterson's motion for summary judgment.

**IT IS THEREBY ORDERED** that**:**

1.    The Court **GRANTS** in part and **DENIES** in part Equifax's motion for summary judgment (Doc. 90).

2.    The Court **GRANTS** in part and **DENIES** in part Trans Union's motion for summary judgment (Doc. 96).

/ / /

3.     The Court **DENIES** Peterson's motion for partial summary judgment (Doc. 83).

Dated this 22nd day of March, 2016.

_____
Honorable G. Murray Snow
United States District Judge